IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

KEENAN HOPKINS SCHMIDT AND ) 
STOWELL CONTRACTORS, INC., )
a Florida corporation, )
                                      )
         Plaintiff, )
                                      )
v. ) Case No. 2:07-cv-383-FtM-34DNF
                                      )
CONTINENTAL CASUALTY COMPANY, ) Judge Thomas A. Wiseman, Jr.
                                      )
         Defendant. )

**MEMORANDUM OPINION**

Before the Court is Defendant Continental Casualty Company's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. No. 89), to which the Plaintiff has filed its Response and Memorandum of Law in Opposition (Doc. No. 113). At the Court's request, the Defendant also filed a reply brief (Doc. No. 124); Plaintiff, with permission, then filed a sur-reply (Doc. No. 132). The motion, having been amply briefed, is ripe for consideration. Pursuant to Local Rule 3.01(j), Plaintiff has requested oral argument on the motion (Doc. No. 114), but the Court finds that oral argument would not be of assistance in resolving the motion. That request is therefore denied.

Further, for the reasons explained below, the Court finds that the Defendant has established that it is entitled to summary judgment. The pending motion will therefore be granted and this matter dismissed.

**I.       INTRODUCTION**

The Plaintiff, Keenan Hopkins Schmidt and Stowell Contractors, Inc. ("Keenan"), filed suit in state court against the Defendant, Continental Casualty Company ("Continental"), for declaratory relief and for damages caused by Continental's alleged breach of its insurance contract with Keenan. This case arises out of an earlier suit ("Underlying Case") brought by Disney Vacation Development, Inc. ("Disney") against McDevitt Street Bovis ("Bovis") for faulty construction of the Disney Boardwalk (hereinafter, the "Boardwalk" or "project site"). Bovis, believing that Keenan was responsible for some of the faulty construction that formed the basis of Disney's complaint, impleaded Keenan into the Underlying Case. In

the present suit, Keenan claims that it tendered the defense and requested indemnification in the Underlying Case from its insurers, including Continental, but that Continental wrongfully refused to defend or to indemnify Keenan. Keenan now urges this Court to issue a judicial declaration that Continental failed to abide by the terms of the insurance contract in effect between Continental and Keenan, and further requests that this Court order Continental to contribute its pro-rata share of the legal fees and settlement costs Keenan and its other insurers incurred in the Underlying Case. After removing the case to federal court, Continental filed the present motion for summary judgment.

## II. THE FACTUAL RECORD

This action arises out of disputes regarding construction defects and damages affecting Disney's Boardwalk. On August 15, 1994, Disney contracted with Bovis as the general contractor to build the Boardwalk. Bovis then subcontracted with Keenan, among other subcontractors. Schedule A to the subcontract between Keenan and Bovis lists a number of items that Keenan was obligated to "furnish and install," including but not limited to:

All exterior architectural trim and surrounds . . . .

. . . .

All exterior architectural: GFRC, Polygarde woodwork, plastic, FRP, trim. . . .

. . . .

All exterior wall and roof, metal and wood framing. Wood framing as it applies to plywood at metal framing and corrugated metal decks.

. . . .

All soffits, eave, fascia, rakes, entablatures, cornices, etc., architectural elements at the envelopes of the buildings and site structures. . . .

(Doc. 91-4, Keenan-Bovis Subcontract, at 11.)

On September 7, 1995, Lyle Painting, the painting subcontractor, contacted Bovis regarding paint failures and delays caused by defective "wood trim." (Doc. 91-6, 9/7/1995 Message from Lyle Painting.) Bovis identified Keenan as the party that had installed the defective "wood trim" and then advised Keenan that it was responsible for resolving the problem. (Doc. 91-7, 9/18/1995 Letter from Bovis to Keenan.)

On October 11, 1995, Disney sent a letter to Bovis regarding extensive water intrusion "through the roofs, exterior facades, expansion joints, unsealed and open slab penetrations, etc.," and stated that

"[t]he source of these problems is directly tied to completion of the roofs and exterior facades." (Doc. 91-9, 10/11/1995 Letter from Disney to Bovis.) This letter described the chaotic situation at the project site and attributed much of the delay in the completion of the roof and exterior facades to the lack of coordination between Bovis and its many sub-contractors, including Keenan. Disney attributed Bovis' inability to "complete the roofing and exterior facades for this project" to a widespread lack of "manpower" on the part of some of the sub-contractors, including Keenan. (Id.) As a result of delays in completing roofing and exterior facades, "drywall, in-wall insulation, and wall finishes [we]re being affected by water intrusion." (Id.)

Disney and Bovis executed a "Close-out Change Order" on August 30, 1997 (Doc. 91-23), pursuant to which Disney agreed to release various claims it had against Bovis, while specifically reserving its right to enforce the obligations contained in the Close-Out Change Order. Attachment H to the "Close-out Change Order" reserves in pertinent part:

> 4.     Paint Defects – Repair or replacement of exterior paint defects including:
>
> > (i)     building decorative shutters;
> >
> > (ii)    balcony divider partitions and running trim;
> >
> > (iii)   exterior façade (e.g., blistering, peeling and premature fading).
>
> . . . .
>
> 6.     Roof Leaks – Repair and replacement of areas of roof where water penetration is occurring . . . .

(Doc. 91-23, at 55.) Keenan was then directed to attend a meeting with Bovis and Disney on October 27, 1997 to resolve the issues caused by the defective "paint or the wood products" supplied by Keenan's sub-contract. (See 10/21/1997 Letter from Bovis to Keenan, Doc. 91-20 (giving notice of the meeting with Disney and advising Keenan to send a representative to the meeting).) A letter dated October 28, 1997 from Bovis to an attorney for Keenan documents that Keenan failed to attend the meeting. That letter documents Bovis' frustration with Keenan's refusal to deal with issues caused by its work:

> My greater concern is the failure of Keenan Hopkins Schmidt & Stowell to attend the meeting which we had requested they attend with the Owner yesterday to deal with outstanding warranty items, particularly those contained in exhibit H of the close out change order.

(Doc. No. 91-21.)

On June 9, 2000, Disney filed a complaint in Florida state court against Bovis, asserting claims for breach of contract based on deficient workmanship relating to the project.  (Doc. No. 91-24, Disney Compl.)  Bovis, in turn, tendered the defense to and demanded indemnification from Keenan on August 29, 2002.  (Doc. No. 91-25.)  Keenan claims that, prior to this tender, it had no knowledge that Disney had sued Bovis.  Despite the tender in 2002, Keenan also claims that it had "no information" that Bovis actually intended to seek damages from *Keenan* until November 9, 2004, when Bovis filed a Third-Party Complaint against Keenan in the Underlying Case for contractual indemnity, common-law indemnity, contribution, and breach of contract.  (Doc. No. 91-22, Bovis 3d Party Compl.)  Bovis specifically alleged that the work performed and/or the materials provided by Keenan "caused damages including but not limited to damages to tangible property other than the work performed under the subcontract from Bovis stemming from the alleged acts and/or omissions within the scope of the work of [Keenan]."  (Doc. No. 113, at 4–5 (quoting Bovis Compl. against Keenan in Underlying Case).)  Bovis and Keenan settled in October 2007.

At all times relevant to this dispute, Keenan possessed insurance coverage under the following commercial general liability ("CGL") policies:  (1) a policy issued by the Zurich family of insurers in effect from 1995 to 1997 (hereinafter, "Zurich Policy") (Doc. No. 112-7); (2) a policy issued by Travelers Indemnity Company and the Aetna Casualty and Surety Company in effect from 1997 through 2000 ("Travelers Policy") (Doc. No. 112-9); and (3) a series of policies issued by Defendant Continental in effect from February 1, 2000 until October 2003 ("the Policy" or "Continental Policy") (Doc. No. 91-3, 112-2, 112-3, 112-4, 112-5, 112-6).  Without actually addressing why, Keenan asserts that the Continental Policy in effect from February 1, 2000 through January 1, 2001 is the Policy that covers the loss for which Keenan now seeks reimbursement, and that is the policy term upon which the parties here have focused.  As discussed below, the Continental Policy covers losses "discovered" by the injured party during the Policy period.  The Court therefore assumes that Keenan focuses on the 2000 Policy because it is clear that Disney, the injured party, necessarily had knowledge of the property damage at issue no later than June 9, 2000, the day it filed suit against Bovis.

Each of the above-referenced policies insured Keenan for up to $2,000,000 for "General Aggregate Limit (Other than Products-Completed Operations)," up to $2,000,000 for "Products-

Completed Operations Aggregate Limit," and $1,000,000 for "Each Occurrence Limit." (Continental Policy at 2; Zurich Policy at 2; Travelers Policy at 14.)

Keenan placed all of its insurers on notice of Bovis' complaint on December 27, 2004. Continental responded on October 31, 2005 by issuing a letter to Keenan stating that it would not provide a defense or indemnity. (Doc. 91-33.) Keenan was ultimately defended in the Underlying Case by Zurich and Travelers, and these insurers collectively spent a large sum of money in defense fees and litigation costs in the Underlying Case. Keenan asserts that, in addition to the sums paid out by the insurers, it was required to pay approximately $292,480 out of its own pocket—$122,980 on attorney fees and defense costs and $169,500 toward the settlement with Bovis. The record is unclear as to exactly why Keenan was required to pay that sum, given the coverage limitations of the Zurich and Travelers Policies. In any event, Keenan filed this action in state court against Continental on June 13, 2007 to recover the costs associated with the Underlying Case, including a pro-rata share of the expenditures made by Zurich and Travelers as well as the amounts paid by Keenan. Continental subsequently removed the case to federal court on the basis of diversity jurisdiction.

Continental has now filed its motion for summary judgment in which it relies primarily upon the express terms of the Policy itself in support of its denial of coverage in this case. Keenan, of course, opposes the motion.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial' " and the court may grant the motion for summary judgment. Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

Conversely, if reasonable minds could disagree on the inferences arising from the material facts, then the court must deny the motion for summary judgment, and the case should proceed to discovery. Anderson, 477 U.S. at 248.

The moving party bears the burden of demonstrating that the material facts underlying all the relevant legal questions raised by the pleadings are not in dispute, or else summary judgment will be denied. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999); Brunswick Corp. v. Vineberg, 370 F.2d 605, 611-12 (5th Cir. 1967). The nonmoving party is not required to present evidence when responding to a motion for summary judgment unless and until the moving party itself has properly supported the summary judgment motion with sufficient evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970). Once the moving party meets this initial burden, then Rule 56(e) requires that the nonmoving party present opposing evidence; it may not "simply rely on the contrary allegation in [its] complaint." Adickes, 398 U.S. at 160 (1970). If the nonmoving party introduces nothing more than a mere scintilla of evidence upon the basis of which a jury could not reasonably find for the nonmoving party, then the motion for summary judgment should be granted. Anderson, 477 U.S. at 252. Additionally, conclusory allegations and conjecture are not sufficient to create a genuine issue of material fact and therefore cannot serve as the basis for denying summary judgment. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996).

## IV. ANALYSIS AND DISCUSSION

Continental raises a number of arguments in support of its assertion it is entitled to judgment in its favor as a matter of law, including:

(1) that because Keenan failed to provide timely notice of the claims made in the Underlying Case, its claims are now barred;

(2) that the Continental Policy provided excess coverage only and, because Keenan had primary coverage from other insurers and was actually defended and indemnified by its primary insurers, Continental has no obligation to reimburse the other insurers for a pro-rate share of the expenditures made in defending and settling the Underlying Case;

(3) that the Policy endorsements expressly relieved Continental of any duty to defend Keenan in the Underlying Suit;

(4) that the applicable deductible amount is in excess of whatever remaining amount Keenan paid out of pocket; and

(5) alternatively, that the exclusion pertaining to known and continuing damage completely bars recovery in this case and, even if the policy did not contain a "known loss" provision, Keenan's claims would be barred by the common-law doctrine of "known loss / loss in progress."

As explained in greater detail below, the Court finds that Continental was not prejudiced by any late notice of Keenan's claim and therefore cannot rely on that defense. However, the Court does find that the Continental Policy, by its unambiguous terms, was intended to provide excess rather than primary insurance coverage. Consequently, Continental has no contractual obligation to reimburse either Zurich or Travelers for any funds they spent defending or indemnifying Keenan in the Underlying Case. With respect to the approximately $292,480 Keenan spent "out of pocket," it remains unclear why Keenan was required to pay that sum and the extent to which any amount of it would properly be reimbursable by an excess insurer. Regardless, Continental is entitled to judgment in its favor with respect to that amount too because: (1) the Continental Policy did not require Continental to defend Keenan in the Underlying Case, such that Continental has no liability for the $122,980 in attorney fees and defense costs incurred by Keenan; and (2) the remainder, approximately $169,500, is less than the applicable deductible amount of $250,000.

Having concluded that Continental is entitled to judgment in its favor on those grounds, the Court has no need to reach Continental's remaining arguments. Notwithstanding, the Court also finds that Disney clearly had knowledge of the property damage at issue no later than 1997, such that Keenan's claims as a whole are apparently barred by the "known and continuing loss" provision in the Policy. This finding provides an alternative basis for summary judgment in favor of Continental.

## A.      Florida Law and the Interpretation of Insurance Contracts Generally

Two countervailing impulses govern the Court's interpretation of the insurance policy at issue. On one hand, Florida courts have long recognized the validity and enforceability of insurance contracts as a matter of public policy, see France v. Liberty Mut. Ins. Co., 380 So. 2d 1155, 1156 (Fla. 3d Dist. Ct. App. 1980), pursuant to which insurance contracts, like other contracts generally, are to be "construed in accordance with the plain language [thereof] as bargained for by the parties." Westmoreland v.

Lumbermens Mut. Cas. Co., 704 So. 2d 176, 179 (Fla. 4th Dist. Ct. App. 1997); see also U.S. Auto. Ass'n v. McCray, 348 So. 2d 6, 8 (Fla. 3d Dist. Ct. App. 1977) (noting that an insurance policy "should be construed according to the entirety of its terms as set forth therein and as amplified by any endorsement thereto" (citing Fla. Stat. § 627.419(1)).   On the other hand, "Florida law is equally well-settled that insuring or coverage clauses are construed in the broadest possible manner to affect the greatest extent of coverage."   Westmoreland, 704 So. 2d at 179.   As a result, "ambiguities are interpreted liberally in favor of the insured and strictly against the insurer who prepared the policy."   Id.   But ambiguity only exists when contractual terms are "subject to opposing reasonable interpretations."   Blue Shield of Fla., Inc. v. Woodlief, 359 So. 2d 883, 884 (Fla. 1st Dist. Ct. App. 1978).   As both parties here recognize, the fact that a policy endorsement contradicts a provision contained in the body of the policy will not necessarily result in ambiguity, because, under Florida law, "to the extent an endorsement is inconsistent with the body of the policy, the endorsement controls."   Steuart Petroleum Co. v. Certain Underwriters at Lloyd's London, 696 So. 2d 376, 379 (Fla. 1st Dist. Ct. App. 1997).

With these principles in mind, the Court now turns to the parties' arguments.

**B.     Continental Was Not Prejudiced by Late Notice of Keenan's Claim.**

One of the arguments raised by Continental which would potentially be dispositive of the entire case is that Keenan's claims under the Policy are barred because Keenan did not provide timely notice to Continental of those claims, as required by the terms of the Policy itself.   In opposition to that argument, Keenan contends that because Continental did not comply with certain Florida statutory requirements, it is precluded from asserting the defense.   Keenan also argues that the late-notice defense fails because Continental was not prejudiced by the late notice.   The Court agrees that Continental's notice argument is without merit.

Under Florida law, an insured's failure to comply with a mandatory contractual provision requiring it to provide written notice to the insurer of a claim "as soon as practicable" may negate an insurer's coverage obligation, but only if the insurer is actually prejudiced by the late notice.   Tiedtke v. Fid. & Cas. Co. of New York, 222 So. 2d 206, 209 (Fla. 1969).   Further, an insurer is ordinarily presumed to be prejudiced if the insured provides late notice of a claim in violation of the provisions of the insurance agreement.   Bankers Ins. Co. v. Macias, 475 So. 2d 1216, 1218 (Fla. 1985).   The insured, however, can

rebut that presumption by introducing evidence tending to show that the insurer was in fact not prejudiced by the late notice of the claim.  Id.  Florida courts have uniformly held that where an insured possesses enough information to permit it to deny the claim on other grounds (and it actually did deny the claim on other grounds), it waives its right to object to coverage on the basis that the insured failed to provide timely notice of the claim.  Nationwide Mut. Fire Ins. Co. v. Beville, 825 So. 2d 999, 1004 (Fla. 4th Dist. Ct. App. 2002); Wegener v. Int'l Bankers Ins. Co., 494 So. 2d 259, 259 (Fla. 3d Dist. Ct. App. 1986); Hartford Accident & Indem. Co. v. Phelps, 294 So. 2d 362, 365 (Fla. 1st Dist. Ct. App. 1974).

In the present case, regardless of whether Continental was required to comply with the statutory guidelines for asserting a late-notice defense,[1] the record reflects that Continental denied coverage— some ten months after receiving notice of the claim—premised not upon the late notice or any resulting detrimental effect on its ability to investigate the claim, but upon Continental's interpretation and application of the terms of the contract itself.  As the Florida Court of Appeals has also concluded under similar circumstances, this Court "cannot conceive that [the defendant] would not have also denied liability on these same grounds had the notice been timely."  Phelps, 294 So. 2d at 365.  The fact that Continental was able to investigate the claim sufficiently to permit it to deny the claim on other grounds effectively rebuts any presumption of prejudice arising from the late notice.  Consequently, Continental has not established that it is entitled to summary judgment on that basis.

C.     The "Other Insurance" Endorsement

The next argument the Court will consider is Continental's contention that the "other insurance" endorsement in the Policy relieves it of any obligation to indemnify either Zurich or Travelers, whose policies provided primary coverage, thereby substantially reducing its liability in this case.  In addition, Continental argues that the "other insurance" endorsement clearly provides that Continental shall have no

---

[1] Keenan also argues that, in order for an insurer to assert a coverage defense based upon late notice by the insured, the insurer generally must meet certain requirements set out in the Claims Administration Statute, Fla. Stat. § 627.426.  See Auto Owners Ins. Co. v. Salvia, 472 So. 2d 486, 488 (Fla. 5th Dist. Ct. App. 1985) (noting that, under the statute, certain coverage defenses are barred unless the insurer exercises compliance with the statute).  However, under Florida law, the Claims Administration Statute does not apply to excess insurers.  Lazzara Oil Co. v. Columbia Gas Co., 683 F. Supp. 777, 782 (M.D. Fla. 1988).  Thus, while failure to strictly comply with the statute will result in estoppel of the claim if the insurer was liable for coverage, it will not result in estoppel when liability for the claim does not otherwise exist.  Country Manors Ass'n.  v. Master Antenna Sys., 534 So. 2d 1187 (Fla. 4th Dist. Ct. App. 1988).  In this case, as discussed more fully below, the Policy unambiguously provides excess coverage.

duty to defend any suit or claim that another insurer has a duty to defend. (Continental Policy at 24.) As discussed below, the Court agrees that the Zurich and Travelers Policies, by their clear terms, provide primary coverage, while the Continental Policy only provides excess "other insurance" coverage. Accordingly, the Court will grant partial summary judgment in favor of Continental on the issue of whether the Continental Policy provided excess rather than primary coverage, thereby substantially limiting Keenan's potential recovery in this case.

To determine whether a policy provides for primary or excess coverage, Florida law requires that courts measure the intent of the parties "solely by the language of the policies *unless* the language is ambiguous." Towne Realty, Inc. v. Safeco Ins. Co., 854 F.2d 1264, 1267 (11th Cir. 1988). A policy may contain language indicating that it is intended to provide primary coverage unless other insurance exists that also provides primary coverage and insures the same loss, in which case the first policy will only provide "excess" coverage after exhaustion of the limits of the second policy. However, where two or more policies that apparently cover the same loss both contain excess "other insurance" provisions, the clauses are deemed "mutually repugnant." American Cas. Co. v. Health Care Indem., Inc., 613 F. Supp. 2d 1310, 1319 (M.D. Fla. 2009). In such situations, "each insurer is then liable for a pro-rata share of the settlement or judgment" in accordance with its policy limits. Twin City Fire Ins. Co. v. Fireman's Fund Ins. Co., 386 F. Supp. 2d 1272, 1278 (S.D. Fla. 2005).

The Continental Policy at issue here contains an unambiguous "other insurance" endorsement, as follows:

> THE PROVISIONS UNDER CONDITION 4. OTHER INSURANCE ARE DELETED IN TOTAL AND REPLACED BY THE FOLLOWING:
>
> IF OTHER VALID AND COLLECTIBLE INSURANCE IS AVAILABLE TO THE INSURED FOR A LOSS WE COVER UNDER COVERAGES A OR B OF THIS COVERAGE PART, THIS INSURANCE IS EXCESS OVER ANY OF THE OTHER INSURANCE, WHETHER PRIMARY, EXCESS, CONTINGENT, OR ON ANY OTHER BASIS.
>
> WHEN THIS INSURANCE IS EXCESS, WE WILL HAVE NO DUTY UNDER COVERAGE A OR B TO DEFEND ANY CLAIM OR "SUIT" THAT ANY OTHER INSURER HAS A DUTY TO DEFEND . . . .
>
> WHEN THIS INSURANCE IS EXCESS OVER OTHER INSURANCE, WE WILL PAY ONLY OUR SHARE OF THE AMOUNT OF THE LOSS, IF ANY, THAT EXCEEDS THE SUM OF:
>
> (1) THE TOTAL AMOUNT THAT ALL SUCH OTHER INSURANCE WOULD PAY

FOR THE LOSS IN THE ABSENCE OF THIS INSURANCE; AND

(2) THE TOTAL OF ALL DEDUCTIBLE AND SELF-INSURED AMOUNTS UNDER ALL THAT OTHER INSURANCE.

(Continental Policy at 24.)

In contrast, the Zurich Policy's "other insurance" provision states, in pertinent part:

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then we will share with all that other insurance by the method described in c. below.

b. Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

1. That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work;"

2. That is "Specific Perils" insurance for premises rented to you; or

3. If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend . . . .

(Zurich Policy at18.)

The Travelers Policy's "other insurance" provision is identical to the Zurich Policy's, except that it identifies slightly different situations where the policy will be considered excess, none of which is applicable here. (Travelers Policy at 33.) In addition, the Zurich and Travelers Policies' "other insurance" provisions are identical to the Continental Policy's unamended and inoperative "other insurance" provision (superseded by the Endorsement), except that it too enumerated slightly different situations in which the policy would be considered excess. (Continental Policy at 55.)

The Court finds that the "other insurance" provision in the Continental Policy unambiguously relieves Continental from any duty to indemnify Keenan for a covered loss until all primary insurance coverage is exhausted, or to defend it against a lawsuit when other insurers have a primary duty to defend. In contrast, the "other insurance" provisions in the Zurich and Travelers Policies recognize that

these policies, respectively, provide primary coverage except in a limited number of specific circumstances, none of which is applicable in this case. Consequently, the insurance policies at issue are not "mutually repugnant." Am. Cas. Co., 613 F. Supp. 2d at 1319. With Zurich and Travelers providing primary coverage, the Continental Policy provides excess coverage only. Continentals' duty to defend and indemnify is therefore "consecutive to, rather than concurrent with," Zurich's and Travelers' duties as primary insurers. Nat'l Union Fire, 214 F.3d at 1273. There is no dispute that the Zurich Policy and the Travelers Policy each provided coverage up to $2,000,000 for "property damage" claims, for a total of $4,000,000, and that Zurich and Travelers did in fact cover the subject loss and provide a defense in the Underlying Case. The other insurers' payments in this case, including defense costs (approximately $1,215,251) and settlement costs (approximately $1,195,000) totaled approximately $2,410,251—less than Zurich's and Travelers' combined policy limits. Because the primary insurers' coverage limits were apparently not exhausted, Continental has no legal duty to reimburse those insurers for the amounts they spent in defending and indemnifying Keenan in the Underlying Case.

Keenan attempts to avoid this result by arguing, based on Appleman on Insurance, that an "other insurance" clause in the Continental Policy will be effective only if the clause "refers to the existence of other insurers that insure the 'same risk, for the benefit of the same [entity[, **during the same period of time**.' " (Doc. No. 124, at 4 (quoting 23-145 Appleman on Insurance § 145.4[C]).) Keenan further argues that because Continental's endorsement "only deals with losses covered under its policy period, and because there are no other concurrent primary policies, the endorsement is inapplicable to the subject loss." (Doc. No. 124, at 4.) This argument is unavailing. The endorsement at issue does not concern the policy periods covered by the other insurance and is not dependent upon whether the policies are "concurrent." Rather, by its terms, the Continental Policy states that "if other valid and collectible insurance is available to the insured for a loss we cover . . . , this insurance is excess over any other of the other insurance. . . ." (Continental Policy at 24.) There is no dispute here that Keenan had "other valid and collectible insurance" "available" to it, of which in fact it availed itself. The fact that the policy periods themselves were not overlapping is therefore of no moment.

In sum, Continental is entitled to judgment in its favor as a matter of law on the question of whether its Policy provided excess insurance based on the existence of other primary insurance available

to Keenan. That determination, in and of itself, will have the effect of reducing Continental's potential liability to only that sum paid out of pocket by Keenan, which Continental apparently concedes for purposes of its motion to be $292,480. (Doc No. 124 at 12.) Of that sum, however, it is not clear how much would actually be payable by Continental even if no other bases existed for reducing its potential liability, because the record before the Court does not reveal why Keenan was required to pay any amount out of pocket in the first place. If it was because of the other policies' deductibles, the exclusionary language "other insurance" endorsement quoted above suggests that Continental is only required to pay the amount of the insured's loss that "exceeds the sum of . . . the total of all deductible and self-insured amounts under . . . other insurance." (Continental Policy at 24.) In addition, Continental would not be required to reimburse Keenan for damages arising from losses that were not covered by the terms of the Continental Policy, such as damages relating to Keenan's own defective work product, as opposed to other property damage caused by Keenan's work. As discussed below, however, these gaps in the factual record are immaterial, because Continental is entitled to judgment in its favor on other grounds as to the remaining sum.

### D. The "Duty to Defend" Endorsement

Separate and apart from the "other insurance" endorsement pursuant to which Continental has no duty to defend when the Continental Policy is excess over other collectible insurance, Continental further argues that it had no duty to defend under the clear terms of the Policy and therefore no obligation to reimburse Keenan for any amounts it paid out toward attorneys' fees or litigation costs. The Court agrees that the policy language unequivocally rejects any such duty.

Under Florida law, the duty to indemnify is separate and distinct from the duty to defend. <u>Allstate Ins. Co. v. RJT Enters.</u>, 692 So. 2d 142, 144 (Fla. 1997). Thus, as the Florida Supreme Court has recognized, "in the absence of an express statutory or contractual duty to defend, there is no such duty." <u>Id.</u> In the present case, neither party has pointed this Court to any statutory provision that might have bearing on the issue. Further, while Keenan argues generally that the duty to defend is broader than the duty to indemnify, that fact is only relevant if the insurer actually has an obligation to defend. Although the coverage portion of the Policy references a duty to defend (Continental Policy at 47), Continental relies upon a superseding endorsement which states, in pertinent part:

5.      THOSE PROVISIONS IN THE POLICY WHICH IMPOSE A DUTY . . . TO DEFEND ANY SUIT SEEKING DAMAGES COVERED UNDER THE POLICY AND OBLIGATE US TO PAY 'SUPPLEMENTARY PAYMENTS'[2] ARE HEREBY DELETED FROM THE POLICY.

6.      WE HAVE NO OBLIGATION TO PAY OR CONTRIBUTE TO ANY ALLOCATED LOSS ADJUSTMENT EXPENSES.  RATHER, YOU WILL PAY ALL SUCH EXPENSES UNDER ALL CIRCUMSTANCES.

FURTHER, ALLOCATED LOSS ADJUSTMENT EXPENSES WILL NOT BE APPLIED TO THE OCCURRENCE OR AGGREGATE DEDUCTIBLE AMOUNT.

ALLOCATION CLAIM EXPENSES SHALL INCLUDE BUT NOT BE LIMITED TO, ALL ADMINISTRATIVE AGENCY AND COURT COSTS, FEES AND EXPENSES, FEES FOR SERVICES OF PROCESS, FEES TO ATTORNEYS, . . . FEES OR COST FOR EXPERTS, COST OF COPIES OF TRANSCRIPTS OF TESTIMONY AT . . . CRIMINAL OR CIVIL PROCEEDINGS, . . . COST OF DEPOSITIONS AND COURT REPORTS OR RECORDED STATEMENTS AND ANY SIMILAR COSTS OR EPXENSES PROPERLY CHARGEABLE TO THE INVESTIGATION OR DEFENSE OF A PARTICULAR CLAIM, OR TO PROTECT YOUR RIGHT OF SUBROGATION.

(Continental Policy at 10–11, 29–30.[3])

In ruling on this motion for summary judgment, the Court must, of course, draw all reasonable inferences from the available evidence in the light most favorable to Keenan as the non-moving party. Arrington v. Cobb County, 139 F.3d 865, 871 (11th Cir. 1998).  Unfortunately for Keenan, the language of the provision set forth above contains no ambiguity that could be resolved in Keenan's favor.  The Court finds as a matter of law that Continental had no duty to defend Keenan under the unambiguous terms of the insurance contract, and Continental is entitled to summary judgment in its favor on that issue.  This conclusion means that Continental has no liability for the $122,980 Keenan paid from its own funds toward legal fees and litigation costs.

### E.      The Applicable Deductible

The Court has determined that Continental had no obligation under the Policy to provide Keenan with a defense in the Underlying Case, and, as excess insurer, has no obligation to indemnify Zurich or

---

[2] "Supplementary payments" are defined in the Policy as expenses incurred by Continental, or incurred by the insured at Continental's request, to assist in the investigation or defense of the claim or suit, costs taxed against an insured in a lawsuit, interest on a judgment, and other litigation-related expenditures.  (Continental Policy at 52.)  In other words, "supplementary payments" are a component of defense costs, and are therefore only incurred in conjunction with paying the costs of defending the insured against a claim or lawsuit.

[3] The provision negating any otherwise existing duty to defend is located under the Deductible Endorsement, and is worded identically in both the $50,000 Deductible Endorsement and the $250,000 Deductible Endorsement.

Travelers for any sums they expended, as primary insurers, in the Underlying Case. Accordingly, the only expenditure remaining in dispute at this point is the $169,500 Keenan paid from its own pocket toward the settlement with Bovis. Continental argues that, because the applicable deductible is $250,000, it has no liability for any portion of that amount. Keenan argues that the deductible was set at $50,000 by a subsequent endorsement for which it paid additional consideration.

There are two "Deductible Endorsements" included in the Policy. The first, setting the deductible at $250,000, went into effect as of the effective date of the Policy, or February 1, 2000. (Continental Policy at 29, 30.) A later endorsement that went into effect on July 1, 2000 set the deductible amount at $50,000. (Continental Policy at 10, 11.) In other words, these endorsements, considered together, are neither ambiguous nor inconsistent; instead, the question of which applies depends upon the effective date of a covered claim. Neither party addresses that question, though Continental asserts conclusorily that "the date of loss is prior to the change in deductible" (Doc. No. 124, at 8), while Keenan asserts, in an equally conclusory fashion, that Continental "was not asked to defend this case until well after" the $50,000 deductible endorsement went into effect. (Doc. No. 113, at 24.)

The Continental Policy, by its terms, covers "property damage," defined as "[p]hysical injury to tangible property," that "occurs during the policy period." (Continental Policy at 59, 47.) Clearly, the damage to Disney's Boardwalk Project "occurred" well before 2000, but the Policy contains a "known and continuing loss endorsement" pursuant to which the Policy also covers damage which first "manifests" during the policy term:

> All claims or suits for . . . "property damage" that is continuous or progressively deteriorating and which "manifest" during this policy period will be deemed to apply only to this policy period and no other policy period.
>
> . . . .
>
> "Manifest(ed)" means . . .
>
> . . . For "property damage" *when the damage is first discovered by the person or organization who suffered such damage*.

(Continental Policy at 46 (emphasis added).)

As previously suggested, it appears that Keenan seeks coverage from Continental under the 2000 Policy based on a theory that Disney, the "organization who suffered such damage," first discovered the damage in 2000. Disney instituted the Underlying Case against Bovis to recover for the same

damages as those at issue in this suit on June 9, 2000; thus, it obviously must have "discovered" the subject damage of the suit at some point prior to that date. Keenan, in support of its argument that the lesser deductible applies, asserts only that Continental "was not asked to defend this case until well after" the $50,000 Deductible Endorsement went into effect. That argument has no merit, in part because Continental was not asked to defend this case until well after the 2000 Policy had expired, so the date upon which a demand for indemnification is made obviously cannot be deemed to control resolution of the question of which deductible applies.

Moreover, under the plain language of the policy, Continental's liability on the contract, if any, accrued when Disney discovered the Property Damage, in this case *no later than* the date Disney filed suit. Since the $50,000 Deductible Endorsement, by its own terms, was not "effective" until July 1, 2000, then, under a plain reading of the contract, it is the original $250,000 deductible which applies. As noted by Couch on Insurance:

> It is important to consider all endorsements and riders before drawing any conclusions as to the effect of a special or general provision. The date the endorsement or rider was issued determines not only the nature of the coverage but also *defines the period of coverage* under its terms. For example, while an endorsement might add coverage of a particular type of risk, there is still no coverage if the loss from such a risk occurred before the effective date of the endorsements.

Couch on Insurance § 22:2.

Because the Deductible Endorsement only applies as of its effective date, it is logical, and necessary, to construe the Policy to require application of the deductible that was in effect on the latest date Disney could have discovered the Property Damage. Simply put, because Disney had knowledge of the property damage prior to the July 1, 2000 effective date of the $50,000 Deductible Endorsement, that endorsement does not apply. Instead, if the losses are covered by the 2000 Policy at all, then the $250,000 deductible must govern. Keenan does not and could not legitimately argue that there exists some ambiguity in the Policy that should be construed in its favor: The Court cannot discern any contractual basis for applying the $50,000 deductible. Any liability Continental may otherwise have had for the $169,500 Keenan paid in indemnity is therefore entirely obviated by the deductible for which Keenan is responsible under the Policy.

## F.    Application of the "Known and Continuing Loss" Policy Endorsement

Another argument raised by Continental which, by itself, is potentially dispositive of the entire

case is based upon the "known loss" provision in the Policy, referenced above, and alternatively upon a common-law known-loss doctrine. Because the Court finds that the express provision of the contract is controlling, there is no need to address the common-law argument.[4]

The "known and loss" endorsement states in relevant part:

> This insurance does not apply to and we have no duty to defend any claim or "suit" seeking damages because of "bodily injury" or "property damage" that *is continuous or progressively deteriorating and which "manifested" prior to the inception or after the expiration of the policy period*;

(Continental Policy at 46 (emphasis added).).  Thus, the relevant question, for purposes of determining whether this endorsement precludes coverage, is when did Disney, as the "person or organization who suffered such damage," become aware of property damage that was the subject of the Underlying Case and is likewise the subject of Keenan's claim for damages against Continental.

Continental argues that it has no liability at all for the damages sought by Keenan, because Disney became aware of the existence of the property damage caused by Keenan no later than 1997, years before Continental contracted with Keenan to provide insurance coverage. Specifically, Continental points to two types of "property damage" caused by Keenan's work that were discovered by Disney prior to the inception of any Continental policy covering Keenan:  (1) paint failures resulting from defective woodwork installed by Keenan, and (2) water intrusion caused by other defective work performed by Keenan.  Keenan, in response, argues that while Disney knew about problems with Keenan's work product itself prior to 2000, there is at least a disputed issue of fact as to when Disney learned of "property damage" covered by the Policy.

### 1. Disney knew that Keenan's defective wood caused Lyle Painting's paint to fail prior to the policy period.

---

[4]  Cf. Gencor Indus., Inc. v. Wausau Underwriters Ins. Co., 857 F. Supp 1560, 1566 n.9 (M.D. Fla. 1994) (noting that it had no need to address the defendant's argument regarding a common law "known loss" doctrine in light of the court's ability to resolve the dispute on other grounds). This Court also observes that Continental has not referenced a single Florida case that actually recognizes the doctrine. In light of that fact, and given that insurance law in Florida is tightly controlled by the interplay between statutes and contracts, it seems unlikely that Florida courts would recognize such a common-law doctrine. The applicable statute, in fact, is Fla. Stat. § 627.409, which lays out the circumstances in which a misrepresentation, omission or concealment of fact by an insured in the course of applying or negotiating for any insurance contract may prevent recovery under the policy. Continental raises an argument under that statute in connection with its "known loss" defense, but the argument is perfunctory at best.  For purposes of the motion for summary judgment, there is clearly a question of fact as to whether Keenan omitted, concealed or misrepresented any fact it was asked or required to disclose.

As a preliminary matter, there appears to be no dispute now that Keenan's (or its subcontractors') work did in fact cause "property damage" on Disney's project site. The record shows that Lyle Painting, and not Keenan, was in charge of painting some of the wood trim that Keenan was responsible for installing. The poor quality of the wood used by Keenan for various trim on the project caused paint failures for Lyle Painting, which in turn caused delays in the overall construction project. Because these paint failures occurred on an aspect of the construction project that was outside the scope of the work assigned to Keenan, they constitute "property damage" under the terms of the contract.

The presence of "property damage" alone, however, is not sufficient to trigger the "known-loss" provisions. Disney must also have "discovered" the "property damage" before Continental's Policy went into effect on February 1, 2000. As a matter of contract interpretation, and contrary to Keenan's implicit assumption, the Continental Policy does not apparently require that Disney attribute the loss in question to Keenan or its subcontractors, or even that it recognize the damage in question as "property damage" falling within the Policy's definition of that term. Rather, the Policy itself requires only that Disney, as the party who suffered the damage, "discover" the damage within the Policy period.

The evidence in the record unequivocally establishes that Disney knew of property damage to the painting performed by Lyle Painting caused by Keenan or its subcontractors no later than 1997. In that regard, the record contains a Memorandum from Charlie Hardiman of Disney cataloguing various problems with the work at the project site, which specifically includes the following reference: "*Paint defects*: The sap or something is bleeding through due to inadequate sealing of the wood before the paint was applied. Unfortunately, the resolution has been to put fresh paint over it. We need to fix the problem not cover it. Additionally, we are finding "alligatoring" of paint on numerous shutters." (Doc. No. 91-11, at 2.) The record contains a second Memorandum from Charlie Hardiman of Disney dated May 22, 1997 identifying the same issues (paint "alligatoring" and sap bleed). (Doc. No. 91-18, at 1.) These problems were eventually attributed to problems with the wood installed by Keenan or its subcontractors rather than to problems with the paint job *per se*. Thus, the record establishes that Disney was aware no later than 1997 of problems with the paint that were caused by underlying problems with the wood for which Keenan was responsible. The question of whether Disney was actually aware that Keenan was responsible for the underlying problems is not material.

**2. Disney knew that Keenan's failure to adequately perform its work resulted in "property damage" through water intrusion.**

Another instance of "property damage" caused by Keenan's work is documented in a 1995 letter from Disney to Bovis regarding water intrusion. In this letter, Disney explicitly stated that it was concerned that Keenan's "coordination" and "manpower" problems were delaying Bovis' completion of the roof and exterior facades, thereby allowing rain water to soak into and damage several portions of the project site. There is no dispute that the damage at issue was "property damage," since Keenan, pursuant to its subcontract with Bovis, was responsible for all "exterior wall and roof" (Doc. No. 91-4, at 11), and Keenan's alleged failure to adequately perform that work directly contributed to water intrusion in the "drywall, in-wall insulation, and wall finishes." (Doc. 91-9, 10/11/1995 Letter from Disney to Bovis ("In the last few months we have continuously discussed problems related to water intrusion in the Hotel and DVS guestroom buildings. The source of these problems is directly tied to completion of the roofs and exterior facades.").) Even more importantly, Disney's 1995 letter clearly confirms that Disney knew of this "property damage" well before the Continental insurance policy period began in the year 2000.

Keenan argues, however, that the letter does not conclusively establish that Disney believed that *Keenan* was responsible for water intrusion, either through faulty or delayed construction. Instead, Keenan contends that Disney was referring to a separate roofing sub-contractor as being responsible for the water intrusion at issue. Upon further scrutiny, however, Keenan's attempt to favorably characterize Disney's 1995 letter falls flat. Disney's letter did not solely attribute the roofing delay to one sub-contractor. It referred to a continued lack of "coordination" with Bovis as the problem that all the sub-contractors mentioned in the letter, including Keenan, shared in common. In addition, however, the letter explicitly singled out "Keenan" as one of the sub-contractors who could not timely complete the roofing due to a lack of manpower. (Id.) Finally, as set forth above, Disney's "discovery" of the property damage under the Policy exclusion does not, on its face, require that it attribute the damage to Keenan.

There simply does not seem to be room for reasonable minds to differ on the possible inferences arising from the facts presented in the record. Anderson, 477 U.S. at 248. Disney knew that the inability of Keenan and other sub-contractors to coordinate and muster sufficient manpower to finish constructing the roof and exterior facades was the source of the water intrusion problems, and Keenan has not adequately supported its assertion that a separate roofing sub-contractor was at fault for the water

intrusion problem. In sum, there is no material issue of disputed fact as to whether Disney "discovered" the property damage, *i.e.*, water intrusion, caused by Keenan's work prior to the inception of the policy.

### 3. The Import of Disney's Knowledge of Property Damage Caused by Keenan's Work

In addition to the above referenced documentation, the Close-Out Change Order dated August 1997 further documents Disney's knowledge of the problems that would later give rise to the 2000 Underlying Case, and in that document Disney specifically reserved its claims related to the above-referenced defects. In sum, Continental has produced evidence documenting the requisite knowledge on the part of Disney, while Keenan has not pointed to any countervailing evidence in the record that would create a material question of fact as to whether Disney had discovered all of the relevant property damage prior to the inception of the 2000 Policy. The Continental Policy expressly excludes coverage of property damage that manifested prior to the inception of the Policy. Keenan does not contend that there are other types of covered property damage (other than the paint issues and water intrusion) that did not manifest until sometime during the first half of 2000 (or later). Consequently, the Court can only presume that all the property damage at issue manifested prior to the inception of the Policy. This conclusion alone is sufficient to dispose of the question of Continental's liability under the 2000 Policy.

## V. CONCLUSION

As set forth above, the Court has determined that:

(1) The "other insurance" endorsement relieves Continental from any liability for amounts paid by Keenan's primary insurers, and limits any potential recovery by Keenan against Continental for monies that Keenan paid out of pocket to only those amounts which are covered by the terms of the Continental Policy and properly payable in indemnity by Continental under the "other insurance" endorsement;

(2) The "duty to defend" waiver relieves Continental from any liability for those amounts spent by Keenan or its primary insurers in defending Keenan in the Underlying Case; and

(3) The $250,000 Deductible Endorsement is applicable because the claims in this case, assuming they are covered by the 2000 Policy at all, matured no later than June 9, 2000, the date Disney initiated the Underlying Case.

Together, these three determinations lead inexorably to a conclusion that Continental is entitled to judgment in its favor as a matter of law as to all damages sought by Keenan in this case. The Court

also makes an alternative finding, however, that the "known-loss" endorsement in the Policy relieves Continental from any liability for any amounts arising out of the "property damage" of which Disney was aware prior to 2000, before the inception of any policy of insurance issued by Continental to Keenan. It appears that all the property damage at issue manifested prior to the Policy's inception. On this basis as well, Continental is entitled to judgment in its favor as a matter of law.

An appropriate order granting Continental's motion for summary judgment and dismissing this case in its entirety will enter.

Thomas A. Wiseman, Jr.,
Senior U.S. District Judge,
Sitting by designation